Filed 9/27/13  P. v. Tapia CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061650 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD234897) |
| RAMIRO ROMAN TAPIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth Kai-Young So, Judge.  Affirmed as modified.

Sachi Wilson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Ramiro Ramon Tapia guilty of two counts of forcible rape (Pen. Code,[1] § 261, subd. (a)(2); counts 1 & 2) and two counts of incest (§ 285; counts 3 & 4). Tapia was sentenced to nine years in state prison.

Tapia on appeal asks us to examine independently about 40 pages of the victim's employment records submitted under seal and determine whether the court abused its discretion when it reviewed the records in camera and ruled to disclose only two: a copy of a social security card and a copy of a resident card. Tapia separately contends the court erred when it failed to stay under section 654 his sentences on counts 3 and 4 for incest, which the court pronounced were to run concurrently with his sentence on counts 1 and 2 for rape.

Based on our independent review of the victim's employment records, we conclude the trial court did not abuse its discretion when it limited disclosure of those records to copies of the social security and resident cards. We also conclude the trial court erred when it failed to stay under section 654 Tapia's sentence on counts 3 and 4. Judgment affirmed, as modified.

BRIEF FACTUAL AND PROCEDURAL OVERVIEW[2]

Maria M. (the victim) was 16 years old when she came to the United States from Mexico. The victim testified a few days after she moved in with her mother's brother,

---

[1]    All statutory references are to the Penal Code.

[2]    We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.)

Tapia (i.e., her uncle), Tapia came into her bedroom at night, pulled the covers off of her bed, looked at her and then left. Tapia began to do this "every night," and his behavior frightened the victim.

The victim testified each day she would help Tapia clean the horse stables at a ranch where Tapia worked. The victim testified while at the ranch Tapia often would touch her breasts under her blouse and unzip her pants and insert his fingers into her vagina. In an effort to stop the touching, the victim grabbed Tapia's hands and told him to stop. Despite the touching, the victim continued to accompany Tapia to work because she did not have money, she was not paying to live with Tapia and his family and she wanted more security than when she lived in Mexico.

The victim testified she initially did not report the inappropriate touching to police because she felt ashamed and because Tapia told her she would be deported. She also did not tell Tapia's wife, her aunt, because she did not think her aunt would believe her.

The victim testified Tapia owned a trailer that he kept at the ranch. In November 2005, Tapia took her to the trailer and asked her to go inside and retrieve a "tool." When she opened the trailer door, he pushed her inside and demanded she lie down on the mattress. When the victim refused, Tapia insisted and "threw [her] on the mattress."

Tapia next demanded she take off her clothes. When she refused, Tapia unbuttoned her pants as she lay on the mattress, pulled them down to her knees and pulled up her blouse to expose her breasts. The victim cried as Tapia was unbuttoning her pants, and she told him in a loud voice that what he was doing to her was wrong and

3

that he was her uncle. Tapia in response said, "'Yes, mija [i.e., my daughter], this is okay.'" After removing the victim's clothes, Tapia quickly removed his pants. Tapia next removed a "small white ball" from his pocket, handed it to the victim and instructed her to put it in her vagina. When she refused, Tapia told her to "'get it in'" her vagina. The victim complied.

The victim testified she cried the entire time Tapia engaged in sexual intercourse with her. She felt "forced" to have sexual intercourse with Tapia because she was afraid of him. She also was afraid he would "kick" her out of his house. When they returned home later that day, the victim took a shower. After her shower, Tapia told the victim she was "hot."

Tapia subsequently introduced the victim to Elena Sanchez. Sanchez ran a house cleaning business. The victim began to earn a "little" money working for Sanchez. Sanchez helped the victim rent a room and, in early January 2006, the victim abruptly left Tapia's home and family.

Sanchez testified in February 2006 Tapia called and told her the victim's mother was ill and needed money. Sanchez gave Tapia the victim's contact information. Tapia called the victim one evening and invited her to dinner at the ranch with him and his family. The victim was frightened when Tapia called her but nonetheless agreed to the dinner because Tapia promised to drive her home afterward and because she missed her cousins, Tapia's daughters.

4

The victim testified it was dark when she and Tapia arrived at the ranch. Tapia told the victim his daughters were inside the trailer. When the victim went to "peek in the trailer," Tapia pushed her inside, threw her on top of the mattress and said, "'Take off your clothes.'" When the victim struggled to leave, Tapia grabbed her by the arm and again threw her on the mattress. Tapia then removed her clothes and demanded she lay down. Tapia handed the victim a "little white ball" and demanded she put it in her vagina. Frightened and crying, the victim told Tapia not to hurt her. Tapia himself put the "little white ball" into the victim's vagina and engaged in sexual intercourse with the victim.

After about 25 minutes, the victim said she wanted to leave. In response, Tapia said, "'Well, go.'" Although the victim was fearful of walking home at night, she did so and estimated it took her about an hour and a half.

Sanchez went to the victim's home when the victim did not show up for work. Crying and shaking, the victim told Sanchez she had been abused and had walked home. The victim subsequently moved to avoid Tapia and later married.

The victim testified she did not see Tapia until April 2011, when Tapia by happenstance patronized a donut shop where she worked. Tapia asked the victim if she was with anybody. The victim responded that she was working alone and that he could not "do anything" to her at the shop. Tapia responded, "'Yes, I can'" and told the victim, "'Let's go to the back [of the shop].'" The victim was scared by Tapia's comments. She

5

demanded Tapia leave and threatened to call the police. She then went to the back of the shop and Tapia left, ostensibly after another customer entered the shop.

When the victim arrived home that night, she appeared frightened, teary and hysterical. The victim and her husband were then living with her husband's uncle. The victim disclosed that Tapia had raped her in a trailer at the ranch about four years earlier and that Tapia had threatened to report her to immigration if she told anyone. A few days later, the victim went to the police. Later that same day, the police helped the victim obtain an emergency restraining order against Tapia.

The victim testified she called the police when Tapia returned to the donut shop about a month later. A police officer testified she found Tapia sitting in his car in the parking lot of the donut shop and the victim inside, hiding behind the counter crying. The officer verbally served Tapia with the restraining order and obtained his phone number.

A few days later, the victim made two recorded pretextual phone calls to Tapia in an effort to obtain incriminating information.[3] During the calls, Tapia said he did not know why he touched the victim's breasts and vagina and admitted having "relations" with the victims on two occasions. Tapia also asked the victim whether "they [were] coming for me" and "what [was] going to happen now." Tapia asked the victim for forgiveness.

---

[3]      We granted Tapia's unopposed motion to augment the appellate record to include the transcript of the phone calls.

DISCUSSION

A. *Employment Records*

1. Brief Additional Background

The defense pretrial subpoenaed the employment records of the victim from the victim's employer, who also happened to be her husband. The subpoena broadly requested "any and all" of the employment records of the victim, including any employment application, tax forms, check stubs and social security information. The defense contended the subpoena sought documents that were relevant to the victim's credibility, including whether the victim had lied about her social security number, date of birth and name. The defense also contended the victim was not credible because she allegedly had engaged in a sexual "relationship" with Tapia in exchange for housing and support.

The court at a hearing in December 2011 found the subpoena overly broad.[4] However, instead of quashing the subpoena and requiring the defense to redraft it, the court agreed to conduct an in camera review of the victim's employment records produced under penalty of perjury by the victim's employer/husband. In so doing, the court found the victim's concerns over the disclosure of her personal information "very legitimate." As noted *ante*, of the approximately 40 pages of records produced in response to the subpoena, the court ruled to disclose two: a copy of a resident card and a copy of a social security card.

---

4    Tapia's unopposed motion to augment the record included the transcript of the December 2011 hearing. (See fn. 3, *ante*.)

7

At trial, the jury was instructed as follows in connection with the two documents: "It is hereby stipulated by both parties that [the victim] has falsely and illegally used the permanent resident card and social security card of another to work. [¶] It is further stipulated that [the victim] was not issued a permanent resident card, nor was she issued a social security card."

2.   Guiding Principles and Analysis

"'Documents and records in the possession of nonparty witnesses and government agencies other than the agents or employees of the prosecutor are obtainable by subpoena duces tecum.' [Citation.]" (*Kling v. Superior Court* (2010) 50 Cal.4th 1068, 1074.) "A criminal defendant has a right to discovery by a subpoena duces tecum of third party records by showing 'the requested information will facilitate the ascertainment of the facts and a fair trial.' [Citation.]" (*People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1316.) "In such case, if the custodian of records objects to disclosure of the information sought, the party seeking the information must make a plausible justification or a good cause showing of need therefor." (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1045.)

"Under Penal Code section 1326, subdivision (c), a person or entity responding to a third party subpoena duces tecum in a criminal case must deliver the subject materials to the clerk of court so that the court can hold a hearing to determine whether the requesting party is entitled to receive them. When, as here, the defendant is the

8

requesting party, the court may conduct that hearing in camera.  (Pen. Code, § 1326, subd. (c).)"  (*Kling v. Superior Court*, *supra*, 50 Cal.4th at p. 1071.)

"A ruling on a motion to compel discovery—like that here—is subject to review for abuse of discretion.  [Citation.]"  (*People v. Ashmus* (1991) 54 Cal.3d 932, 979.)  In order to determine whether the trial court has abused its discretion, the appellate court must independently review the records in question.  (See *People v. Avila* (2006) 38 Cal.4th 491, 606–607.)

Here, we independently reviewed all of the sealed employment records of the victim subpoenaed by Tapia and produced under penalty of perjury by the victim's employer/husband.  We conclude the trial court did not abuse its discretion when it limited the disclosure of the victim's employment records to the two that were the subject of the parties' stipulation at trial, inasmuch as the undisclosed records do not contain any additional material information that would have assisted the defense in this case—including impeaching the victim's testimony—or otherwise would have had any effect on the outcome.

B.  *Sentencing*

The People concede the trial court erred when it imposed concurrent sentences on counts 3 and 4 for Tapia's incest convictions—rather than stay those sentences under section 654—because each incest conviction was based on the same act and committed with the same intent as the corresponding rape charges in counts 1 and 2.  (See *People v. Daniels* (1969) 1 Cal.App.3d 367, 378 [concluding it was error to sentence the defendant

9

to concurrent sentences for the rape of his daughter when count 1 for rape and count 2 for incest arose out of "a single criminal act" and concluding in such circumstances the defendant may be punished pursuant to section 654 only for the more serious offense, which was rape].)

We agree. As such, we modify the judgment of conviction of Tapia to stay under section 654 his concurrent sentences in counts 3 and 4 for violation of section 285.

DISPOSITION

The judgment of conviction is modified to stay under section 654 Tapia's concurrent sentences in counts 3 and 4. As modified, the judgment of conviction is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting the modified judgment and to forward a certified copy thereof to the California Department of Corrections and Rehabilitation.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

O'ROURKE, J.

10